Harry OLSEN, Plaintiff-Appellant, Cross-Appellee,

v.

UNITED PARCEL SERVICE and Teamsters Local Union No. 705, Defendants-Appellees, Cross-Appellants.

Nos. 88-1299, 88-1382.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 11, 1989.

Decided Jan. 5, 1990.

Rehearing Denied Feb. 13, 1990.

John K. Kneafsey (argued), Chicago, Ill., for plaintiff-appellant, cross-appellee.

Steven H. Adelman (argued), Michael N. Petkovich, John A. McDonald, Keck, Mahin & Cate, S.J. Adelman, Sonnenschein, Carlin, Nath & Rosenthal, and David Mathews (argued), Carmell, Charone, Widmer, Mathews & Moss, Chicago, Ill., for defendants-appellees, cross-appellants.

Before BAUER, Chief Judge, CUDAHY, Circuit Judge, and GRANT, Senior District Judge.[*]

GRANT, Senior District Judge.

The appellant, Harry Olsen, filed a hybrid § 301/fair representation suit against the United Parcel Service ("UPS") and Teamsters Local Union No. 705 ("Local 705" or "the Union"), alleging that UPS violated the terms of the collective bargaining agreement in terminating his employment without just cause and that Local 705 breached its duty of fair representation in processing his grievance. The district court entered summary judgment in favor of the defendants and Mr. Olsen appeals. We now vacate the summary judgment order and remand this case to the district court.

## I.

The appellant, Harry Olsen, was hired by the United Parcel Service as a tractor-trail-

[*] The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

er driver in 1969 and continued in the employ of UPS until his discharge on March 3, 1986.[1] Upon returning to the UPS facility on March 3, the appellant, a white man, engaged in a heated exchange with a black security guard. The guard asked the appellant to turn off his tractor engine and, when the appellant refused, words were exchanged, with the appellant resorting to racial slurs against the guard. The appellant telephoned UPS Supervisor Rudolph Chambers at the UPS dispatch office, but, rather than speaking to Mr. Chambers, continued to argue with the security guard. Mr. Chambers heard the appellant use racial epithets over the telephone and went to discuss the matter with UPS Night Manager Charles Dwyer. The appellant interrupted the meeting between Mr. Chambers and Mr. Dwyer, still complaining about the security guard. Mr. Chambers chastised the appellant and insisted that racial remarks would not be tolerated—regardless of the provocation. At that point, the appellant accused Mr. Chambers of siding with the guard and directed his racial remarks to Mr. Chambers, who is also a black man. Mr. Chambers "fired" the appellant at that point,[2] and the appellant subsequently filed a grievance with Local 705.

At a grievance meeting with UPS officials, Local 705 business representative Frank Snow requested that UPS show the appellant leniency, but UPS refused. The appellant next appealed to the four-man Joint Grievance Committee ("JGC") established pursuant to Article 19 of the collective bargaining agreement then in effect between UPS and Local 705. The JGC was comprised of an equal number of union and management officials, with Mr. Snow serving as one of the union representatives and Amos Coleman, one of the UPS officials involved in the decision to discharge the appellant, serving as one of the two UPS representatives. At the JGC hearing, the appellant conceded that he used racial epithets on March 3, but argued that he had been provoked by Mr. Chambers. The appellant claimed that when he entered the UPS dispatch office, Mr. Chambers upbraided him and hurled a forty-gallon garbage container in his direction. The Local 705 representative assisting the appellant in his appearance before the JGC requested reinstatement based on the appellant's length of service and driving record, but the JGC denied the grievance petition and upheld the UPS decision to discharge the appellant.

The appellant subsequently filed suit in federal district court under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, alleging that UPS violated the collective bargaining agreement in discharging him from its employ without just cause and that Local 705 breached its duty of fair representation in processing his grievance. In support of his claim that Mr. Chambers provoked the argument inside the UPS office, the appellant submitted affidavits from two former UPS officials declaring that Mr. Chambers had "a very short fuse" and that he would frequently throw objects and resort to foul language when angry. Affidavit of Martin W. Linskey, Sr. ¶ 7; Affidavit of Donald Cuzack ¶ 11. In addition, the appellant adduced evidence that UPS sought to remove the appellant and that Local 705, as part of its agreement with UPS to protect black union members at the expense of its white members, cooperated with UPS to remove the "unprotected" employees. *See* Affidavit of Harry Olsen ¶ 9; Affidavit of Martin W. Linskey, Sr. ¶¶ 6, 11, 12; Affidavit of Donald Cuzack ¶ 16. The appellant further alleged that, with respect to his grievance, Local 705 assisted UPS in securing his discharge in breach of its duty of fair representation. Affidavit of Harry Olsen ¶¶ 7,

---

1. There is some dispute as to whether the events in question took place on March 3 or March 11, 1986. Inasmuch as the exact date of the incident is not critical to the resolution of the instant appeal, we have simply selected the date cited by the appellant and Local 705 in their briefs.

2. Apparently, Mr. Chambers lacked the authority to effect a formal discharge. The final decision to discharge the appellant was made by a panel of UPS officials, including Amos Coleman, who was later to serve on the JGC ruling upon the appellant's grievance.

8, 9. *See* Affidavit of Martin W. Linskey, Sr. ¶ 11; Affidavit of Donald Cuzack ¶¶ 16, 17.

The district court reviewed the appellant's arguments and identified five points of contention regarding the representation he received from Local 705 in the processing of his grievance: (i) the Union failed to conduct an investigation of the facts surrounding the incident; (ii) the Union improperly selected Mr. Snow to serve on the JGC, inasmuch as he was related to one of the UPS Committee members; (iii) the Union failed to object to the composition of the JGC; (iv) the Union failed to present all of the evidence on the appellant's behalf; and (v) the Union conspired with UPS to discharge the appellant because of his race. The district court found no evidence to support claims (ii)-(iv) and ruled that the Union's failure to investigate constituted a perfunctory handling of the grievance at best. *Olsen v. United Parcel Service*, No. 86 C 4037, mem. op. at 3-5, 1988 WL 4997 (N.D.Ill.1988). With respect to the allegations of a racially-based motive for dismissal and union cooperation in such activity, the district court admitted that the appellant had raised "a more colorable claim" on that question, but ruled that "it too lacks any significant factual support creating an issue of material fact." *Id.* at 5. The court reasoned that the evidence submitted by the appellant, consisting of a statement made five years before by a former UPS employee that "the company buys and sells who they want through the union" and the affidavit of Mr. Cuzack that "if a black truck driver had engaged in conduct similar to Olsen's, the driver would not have been discharged," when coupled to the fact that the appellant is white and Mr. Chambers black, "presents no evidence suggesting that his discharge was motivated by racial reasons and the Union conspired in the discharge decision." *Id.* at 6. As such, the district court granted the defendants' motions for summary judgment and entered judgment in favor of the defendants on January 19, 1988. The appellant filed this timely notice of appeal on February 17, 1988. We have jurisdiction to entertain the instant appeal pursuant to § 301(a) of the LMRA, 29 U.S.C. § 185(a), and 28 U.S.C. § 1291.

## II.

Although the § 301 action against UPS is formally distinct from the fair representation claim against Local 705, *Reed v. United Transportation Union*, — U.S. —, 109 S.Ct. 621, 627, 102 L.Ed.2d 665, 677 (1989), the two causes of action are "inextricably interdependent," *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 164-65, 103 S.Ct. 2281, 2290-91, 76 L.Ed.2d 476 (1983), and the composite frequently referred to as a "hybrid" § 301/fair representation suit. *See Reed*, 109 S.Ct. at 627, 102 L.Ed.2d at 677; *Johnson v. Artim Transportation System, Inc.*, 826 F.2d 538, 541 n. 1 (7th Cir.1987), *cert. denied*, 486 U.S. 1023, 108 S.Ct. 1998, 100 L.Ed.2d 229 (1988); *Flores v. Levy Co.*, 757 F.2d 806, 808 (7th Cir.1985). In order for an employee to maintain an action against his employer under § 301 of the LMRA, he must first establish that the union breached its duty of fair representation in processing his grievance. *See, e.g., United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 62, 101 S.Ct. 1559, 1563, 67 L.Ed.2d 732 (1981); *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 570-71, 96 S.Ct. 1048, 1059-60, 47 L.Ed.2d 231 (1976); *Vaca v. Sipes*, 386 U.S. 171, 186, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967); *Adams v. Budd Co.*, 846 F.2d 428, 431-32 (7th Cir. 1988), *cert. denied*, — U.S. —, 109 S.Ct. 791, 102 L.Ed.2d 782 (1989); *Flores*, 757 F.2d at 808; *Huffman v. Westinghouse Electric Corp.*, 752 F.2d 1221, 1223 (7th Cir.1985); *Superczynski v. P.T.O. Service, Inc.*, 706 F.2d 200, 203-04 (7th Cir.1983).

The Supreme Court has implied the duty of fair representation from the structure of the LMRA and the union's status as the exclusive bargaining agent for a group of employees. *See Reed*, 109 S.Ct. at 627, 102 L.Ed.2d at 677; *DelCostello*, 462 U.S. at 164, 103 S.Ct. at 2290; *Bowen v. United States Postal Service*, 459 U.S. 212, 226, 103 S.Ct. 588, 596, 74 L.Ed.2d 402 (1983); *Vaca*, 386 U.S. at 177, 87 S.Ct. at 909; *Humphrey v. Moore*, 375 U.S. 335, 342, 84

S.Ct. 363, 368, 11 L.Ed.2d 370 (1964); *Ford Motor Co. v. Huffman,* 345 U.S. 330, 337, 73 S.Ct. 681, 685, 97 L.Ed. 1048 (1953). Given the federal labor policy of promoting the private settlement of labor disputes, *e.g., Reed,* 109 S.Ct. at 628, 102 L.Ed.2d at 677; *DelCostello,* 462 U.S. at 162, 103 S.Ct. at 2289; *Bowen,* 459 U.S. at 225, 103 S.Ct. at 596; *Hines,* 424 U.S. at 571, 96 S.Ct. at 1059; *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 549, 84 S.Ct. 909, 914, 11 L.Ed.2d 898 (1964); *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation,* 363 U.S. 574, 581, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. American Mfg. Co.,* 363 U.S. 564, 566, 80 S.Ct. 1343, 1345, 4 L.Ed.2d 1403 (1960); 29 U.S.C. § 173(d), the courts have afforded great deference to the dispute settlement mechanisms contained in collective bargaining agreements. *See, e.g., W.R. Grace & Co. v. Rubber Workers,* 461 U.S. 757, 764, 103 S.Ct. 2177, 2182, 76 L.Ed.2d 298 (1983); *Hines,* 424 U.S. at 562, 96 S.Ct. at 1054; *Enterprise Wheel,* 363 U.S. at 596, 80 S.Ct. at 1360; *Warrior & Gulf,* 363 U.S. at 581, 80 S.Ct. at 1352; *American Mfg.,* 363 U.S. at 566, 80 S.Ct. at 1345; *Jones Dairy Farm v. Local No. P–1236, United Food & Commercial Workers Int'l Union,* 760 F.2d 173, 176 (7th Cir.1985); *Freeman v. Local Union No. 135, Chauffeurs, Teamsters, Warehousemen & Helpers,* 746 F.2d 1316, 1319 (7th Cir.1984). Unless the union's conduct in processing a grievance is "arbitrary, discriminatory, or in bad faith," *Vaca,* 386 U.S. at 190, 87 S.Ct. at 916, and, as a result, "seriously undermines the integrity of the arbitral process," *Hines,* 424 U.S. at 567, 96 S.Ct. at 1055, the courts will not displace the decision of the adjudicative body established by the collective bargaining agreement. *See Flores,* 757 F.2d at 808; *Huffman,* 752 F.2d at 1223.

As the exclusive bargaining representative for the employee unit in question, Local 705 owed the appellant, as a member of that unit, a duty of fair representation. As our recent decision in *Thomas v. United Parcel Service, Inc.,* 890 F.2d 909 (7th Cir. 1989), explained, however, the content of the duty of fair representation is to be determined by the nature of the union function giving rise to the claim of unfair representation. 890 F.2d at 916. *See also Parker v. Connors Steel Co.,* 855 F.2d 1510, 1519 (11th Cir.1988) ("the nature of the duty of fair representation which a Union owes its members is determined by considering the context in which the duty is asserted"). Thus, in the negotiation of a collective bargaining agreement, the union must exercise its "broad authority," *Humphrey,* 375 U.S. at 342, 84 S.Ct. at 367, to secure the multifarious needs of its members, *Hines,* 424 U.S. at 563, 96 S.Ct. at 1055; *Humphrey,* 375 U.S. at 343, 84 S.Ct. at 368; *Thomas,* 890 F.2d at 916–18; Harper & Lupu, *Fair Representation as Equal Protection,* 98 Harv.L.Rev. 1212, 1260 (1985), many of whom have conflicting demands and interests. *Humphrey,* 375 U.S. at 349–50, 84 S.Ct. at 371–72; *Ford Motor Co.,* 345 U.S. at 337–38, 73 S.Ct. at 685–86; *Steele v. Louisville & Nashville Railroad Co.,* 323 U.S. 192, 203, 65 S.Ct. 226, 232, 89 L.Ed. 173 (1944); *Thomas,* 890 F.2d at 917; *Sutton v. Weirton Steel Division of Nat'l Steel Corp.,* 724 F.2d 406, 412 (4th Cir.1983). Given the fact that a union must seek to promote the good of its employees *as a group* in the negotiation context, and that many of the individual interests may conflict, the union must be permitted to exercise broad discretion in its negotiative capacity. The union meets its duty of fair representation at this stage by exercising its judgment in a manner that is not patently unreasonable. *Parker,* 855 F.2d at 1520 (a union breaches its duty in the negotiation of an agreement if its conduct is "arbitrary, irrational, or undertaken in bad faith"). So long as the union does not intentionally harm a member or class of members, it will be deemed to have represented its members fairly.

Once the critical value and policy choices have been made during the negotiation of the collective bargaining agreement, the range of alternative courses of action open to the union are narrowed and its duty of

fair representation varies accordingly. *See Thomas*, 890 F.2d at 917. In administering a collective bargaining agreement, the union enjoys less discretion and is therefore entitled to less deference by the courts. *Id.* As a result, a number of courts have adopted a bifurcated standard in fair representation claims arising out of the negotiative or administrative contexts. *See, e.g., Thomas*, 890 F.2d at 917–18; *Parker*, 855 F.2d at 1519–20; *Swatts v. United Steelworkers of America*, 808 F.2d 1221, 1224 (7th Cir.1986); *Schultz v. Owens–Illinois, Inc.*, 696 F.2d 505, 514–15 (7th Cir.1982). Even within the administrative context itself, the union functions in various capacities, *e.g.*, as the interpreter of the collective bargaining agreement and as the processor of grievances. *Thomas*, 890 F.2d at 918. "Just as one may distinguish between the union's role as negotiator from its role as administrator, and then again between its role as interpreter of the agreement from that of processor of a grievance in the administering of a collective bargaining agreement, so too the union frequently serves a number of functions in the grievance process itself." *Thomas*, 890 F.2d at 919.

In the case presently before this Court, Local 705 served in at least two distinct roles in the grievance process: (i) as the appellant's representative before the JGC; and (ii) as a member of the JGC itself.

■ In assisting a grievant appearing before a JGC, the union functions as both advocate and counselor to the union member. *See, e.g., Thomas*, 890 F.2d at 919; *Dober v. Roadway Express*, 707 F.2d 292, 294 (7th Cir.1983); *Graf v. Elgin, Joliet and Eastern Railway Co.*, 697 F.2d 771, 779 (7th Cir.1983). The duty to the member is much more focused and exclusive than in the case of contract negotiations or in any other context. The union must provide reasonable assistance to the union member, including, but not limited to, helping the grievant to secure the materials necessary for a fair hearing, putting forward the strongest arguments one could reasonably make on the grievant's behalf, and other forms of assistance or represen-

tation necessary for the grievant to adequately prosecute his grievance. *See Thomas*, 890 F.2d at 919–20; *Ames v. Westinghouse Electric Corp.*, 864 F.2d 289, 293 (3d Cir.1988); *Rupe v. Spector Freight Systems, Inc.*, 679 F.2d 685, 694 (7th Cir.1982); *Miller v. Gateway Transportation Co.*, 616 F.2d 272, 277 (7th Cir. 1980); *Baldini v. Local 1095*, 581 F.2d 145, 152 (7th Cir.1978).

The appellant raises four objections to the representation he received from Local 705 in its representative capacity: (i) Frank Snow, one of the two Local 705 officials sitting on the JGC, was related to one of the UPS members of the Committee; (ii) Local 705 failed to present all of the evidence it possessed on the appellant's behalf; (iii) Local 705 failed to object to the composition of the JGC and the UPS representatives on the Committee in particular; and (iv) Local 705 failed to conduct an investigation of the underlying incident giving rise to the petition. We will address each objection in turn.

The district court was quite correct in observing that there is simply no evidence that Mr. Snow was related to one of the UPS representatives sitting on the JGC or that Local 705 failed to present all of the evidence on the appellant's behalf. *Olsen*, mem. op. at 4–5. The appellant's contention that the Union should have objected to the composition of the JGC is similarly misplaced, for Local 705 did not possess the right to object to the UPS officials selected to serve on the JGC under the collective bargaining agreement. *Olsen*, mem. op. at 5. Thus, we are left with the Union's failure to investigate as the lone objection worthy of serious consideration at the representation stage of the grievance process.

■ It is now clear in this Circuit that the duty of fair representation required Local 705 to provide as much assistance as the merits of the appellant's grievance petition demanded, but it is equally clear that "fair representation" must be determined by the totality of the circumstances. *Thomas*, 890 F.2d at 919–20. While we can imagine situations in which a union's failure to investigate might constitute substan-

tial evidence of a breach, the mere failure to investigate, in itself, does not constitute a breach of the duty of fair representation. Moreover, unions always retain the authority to exercise an independent judgment on the merits of each petition, *Thomas,* 890 F.2d at 919, subject only to the requirements of "complete good faith and honesty." *Vaca,* 386 U.S. at 177, 87 S.Ct. at 910. It is well-established that a union is not required to process a grievance through arbitration, *Hines,* 424 U.S. at 567, 96 S.Ct. at 1057; *Vaca,* 386 U.S. at 192, 87 S.Ct. at 918; *Humphrey,* 375 U.S. at 349, 84 S.Ct. at 371; *Freeman v. Local Union No. 135 Chauffeurs, Teamsters, Warehousemen & Helpers,* 746 F.2d at 1322, but need only press a grievance as far as its merits warrant. *Humphrey,* 375 U.S. at 349, 84 S.Ct. at 371 ("a union must be free to sift out wholly frivolous grievances"). The material facts of the incident leading to the appellant's termination were not in serious dispute, and, once the appellant acknowledged that he made the remarks in question, the Union might well have considered an investigation superfluous. While we might recommend that unions conduct investigations in the ordinary course of processing grievances, such a recommendation is more akin to a counsel of perfection than the imposition of a strict obligation. In the instant case, Local 705's failure to investigate seems to reflect a tactical decision as to the usefulness of an investigation rather than a deliberate attempt to undermine the appellant's grievance. The Union's failure to investigate in the present case hardly rises to the level of a breach of its duty of fair representation. While the Union's decision not to investigate might have been an "error[ ] in judgment," *Hines,* 424 U.S. at 571, 96 S.Ct. at 1059, and perhaps even negligent representation, it falls short of the intentional misconduct standard adopted by this Circuit in *Hoffman v. Lonza,* 658 F.2d 519 (7th Cir.1981), or even the "egregious conduct" standard suggested in *Dober,* 707 F.2d at 295, *Graf,* 697 F.2d at 778–79, and *Rupe,* 679 F.2d at 691–92.

The appellant's repeated attempts to focus on Mr. Chambers' reputation for foul language, violence, and racial comments might have been relevant to the question of whether the alleged provocation made dismissal too harsh a punishment, but this Court is not the proper forum to decide the merits of a grievance. At best, the references to Mr. Chambers indicate that an investigation might have been helpful to the appellant, but, as we have just noted, Local 705's failure to investigate does not constitute a breach of its duty of fair representation.

■ The appellant's final argument challenges the fairness of the JGC hearing itself. The appellant has, rather ironically, raised the specter of racial discrimination *against whites* as the reason for his dismissal. More specifically, the appellant contends that Local 705 cooperated with UPS in removing certain employees on the basis of race. As evidence of such a conspiracy between Local 705 and UPS, the appellant has proffered only the fact that he is white and a sworn statement by former UPS Supervisor Martin Linskey that "black drivers would have many accidents and be protected and the white drivers would be fired if they had any." Affidavit of Martin W. Linskey, Sr. ¶ 6.

Although we have only recently held that union officials sitting on JGCs are serving in an essentially arbitral role, and that such a role does not lend itself to partisan representation, *Thomas,* 890 F.2d at 920, discrimination by unions against grievants on the basis of race has historically been considered a breach of the duty of fair representation. *See, e.g., Goodman v. Lukens Steel Co.,* 482 U.S. 656, 668–69, 107 S.Ct. 2617, 2624–25, 96 L.Ed.2d 572 (1987); *Vaca,* 386 U.S. at 177, 87 S.Ct. at 910; *Steele,* 323 U.S. at 201–04, 65 S.Ct. at 231–33; *Babrocky v. Jewel Food Co.,* 773 F.2d 857, 868 (7th Cir.1985); *Dober,* 707 F.2d at 294. In order for a JGC to serve a meaningful purpose as the final arbiter of employment-related disputes, committee members must be permitted to evaluate each grievance on its merits and arrive at a more or less just decision. *Thomas,* 890 F.2d at 920–21; *Tongay v. Kroger Co.,* 860 F.2d 298, 300 (8th Cir.1988); *Grant v. Burlington Industries,* 832 F.2d 76, 80 (7th

Cir.1987); *Early v. Eastern Transfer*, 699 F.2d 552, 560 (1st Cir.1983); *Beckett v. Anchor Motor Freight*, 113 L.R.R.M. 2608, 2613, 1982 WL 2036 (S.D. Ohio 1982). As a result, we have held that fair representation in the JGC context is met by the fair and impartial consideration of grievances without regard to "political, religious, *racial*, ethnic, personal, or otherwise impermissible factors...." *Thomas*, 890 F.2d at 922 (emphasis added).

The appellant-grievant has alleged intentional misconduct on the part of his union based upon his race. It is clear that intentional discrimination against a union member is a blatant breach of the duty of fair representation. *DelCostello*, 462 U.S. at 164, 103 S.Ct. at 2290; *Vaca*, 386 U.S. at 190, 87 S.Ct. at 916; *Humphrey*, 375 U.S. at 342, 84 S.Ct. at 367; *Antrim v. Burlington Northern, Inc.*, 847 F.2d 375, 378 (7th Cir.1988); *Adams*, 846 F.2d at 433; *Camacho v. Ritz–Carlton Water Tower*, 786 F.2d 242, 243–44 (7th Cir.1986), *cert. denied*, 477 U.S. 908, 106 S.Ct. 3282, 91 L.Ed.2d 571 (1986).

The evidence of racial discrimination adduced by the appellant is radically insufficient, however, to raise a genuine issue of material fact for at least three reasons (i) the statement by Mr. Linskey is ambiguous as to whether the allegedly discriminatory action was taken by UPS or Local 705; (ii) there is no indication that white drivers were unjustly punished by the Union; and (iii) there is no direct connection between Mr. Linskey's statement and the appellant, other than the appellant's race. The mere fact that an employee is white and a single general statement that black employees were seldom disciplined does not, in our view, raise a genuine issue as to racial discrimination, for no rational trier of fact could find for the appellant on such scant evidence.

■ If the appellant has failed to adduce sufficient evidence of racial discrimination, he has, perhaps inadvertently, presented substantial evidence of a conspiracy between Local 705 and UPS to remove selected employees. The appellant has submitted evidence to support both the major and minor premises of the following syllogism:

*Major Premise*—The Union cooperated with UPS to remove unwanted employees, *see* Affidavit of Donald Cuzack ¶ 16 ("Frank Snow was very pro-management.... If management wanted to get rid of a driver, the union would cooperate"); Affidavit of Martin W. Linskey, Sr. ¶¶ 11, 12 ("Frank Snow ... had arrangements with management that certain people were protected;" "If you are one of the boys the Union protects you. Everything is predetermined between the Union and management");

*Minor Premise*—UPS wanted to discharge the appellant, Affidavit of Donald Cuzack ¶ 17 ("Management wanted to get rid of Harry Olsen and this was well-known").

As a result, a rational trier of fact could conclude that Local 705 cooperated with UPS in "get[ting] rid of" the appellant. We make no attempt to assess the credibility of the affiants or review the correctness of the JGC decision. We rule only that the appellant has raised a genuine issue as to a material fact, *i.e.*, the *bona fides* of the Union in processing his grievance, and that the remaining questions are properly decided by the trier of fact. As such, the entry of summary judgment in favor of the defendants was inappropriate.

■ Local 705 requested Rule 11 sanctions against Olsen for making allegations in his original complaint that were not included in the amended complaint and which appeared to be without any basis in fact. The Union challenged the district court's denial of that request on appeal.

In *Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928 (7th Cir.1989) (*en banc*), we adopted a deferential standard in reviewing Rule 11 sanction decisions. As we noted in *Mars Steel:*

Fact-intensive disputes, those whose resolution is unlikely to establish rules of future conduct, are reviewed under a deferential standard because the role of appellant courts in establishing and articulating rules of law is not at stake. District judges have the best information

about the patterns of their cases, information appellate judges could duplicate only at great cost in time.

*Id.* at 933.

We have previously determined that the entry of summary judgment in favor of UPS and Local 705 was inappropriate. Under the circumstances, we find no abuse of discretion in the district court's decision to deny the defendants' motion for sanctions under Fed.R.Civ.P. 11.

### III.

For the foregoing reasons, we now (1) VACATE the district court order entering summary judgment and REMAND the case to the district court for further proceedings not inconsistent with this decision, and (2) AFFIRM the district court's denial of defendants' motion for Rule 11 sanctions.